# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| BEAL BANK USA f/k/a BEAL BANK NEVADA, a Nevada corporation, <br><br> Plaintiff, <br><br> vs. <br><br> CROWN BANK, a Minnesota corporation; STONEARCH FUND IV, LLC, a Minnesota limited liability company; THE CITIZENS STATE BANK OF OLIVIA, a Minnesota corporation; NORTH AMERICAN BANKING COMPANY, a Minnesota corporation; and BRUCE K. HOYT, a Minnesota citizen, <br><br> Defendants. | CIVIL ACTION: _____ <br><br><br> **COMPLAINT** |

Plaintiff, Beal Bank USA f/k/a Beal Bank of Nevada ("Beal"), by and through its attorneys, BOWMAN AND BROOKE LLP, for its Complaint against Defendants, Crown Bank ("Crown"); The Citizens State Bank of Olivia ("Citizens"); North American Banking Company ("North American"); Bruce K. Hoyt and StoneArch Fund IV, LLC, ("StoneArch IV") states and alleges with knowledge respecting its own actions and otherwise upon information and belief, as follows:

## INTRODUCTION

1.   Henry Gondorff, Paul Newman's character in *The Sting*, counseled a confidant, "You have to keep this con even after you take his money.  He can't know you took him." Defendants in this case ripped a page from Gondorff's playbook and are liable to Beal because of their misconduct -- a scheme wherein they brazenly conspired with an entity controlled by their very own borrower to deprive Beal of its contractual rights and benefits.

2.      It all started in 2007, when Crown loaned Steven B. Hoyt $3,000,000 and simultaneously entered into participation agreements with three other banks: Defendant Citizens State Bank of Olivia, Defendant North American Banking Company, and BankFirst. The participation agreements made Crown the lead bank responsible for servicing the loan agreement with Steven B. Hoyt ("Hoyt") and remitting payments on the loan to the participants in amounts proportionate to their shares of participation.

3.      The South Dakota Division of Banking closed BankFirst in July of 2009 and appointed the Federal Deposit Insurance Corporation as its receiver ("FDIC-R"). The FDIC-R assigned various of BankFirst's assets to Beal. Those assets included the participation agreement with Crown Bank for an undivided 50% interest in the $3,000,000 loan to Hoyt.

4.      Since Beal acquired its interest in the Participation Agreement, Crown has characterized Beal disparagingly. As a result, Crown viewed Beal as less deserving of fair treatment than participants North American and Citizens, which had acquired their participations earlier.

5.      Subsequent to at least one loan extension, Hoyt's loan matured, per its terms, in June 2010. Instead of paying the loan, however, Hoyt tried to renegotiate new terms with Crown. Beal is informed and believes that, as a longtime customer of Crown, Hoyt held significant sway with Crown, which was eager to accommodate Hoyt's request because Crown held several other loans in which Hoyt was the borrower or guarantor—loans that were undersecured and/or in default.

6.      With enforcement of the loan looming, Crown pleaded with Beal and the other participants to renegotiate Hoyt's loan and associated obligations. Citizens and North American agreed. Beal did not. Beal wanted full payment of the loan according to the express terms of the

1583619-EA 2

loan. In September 2010, pursuant to the participation agreement it acquired in the BankFirst asset purchase, Beal demanded that Crown fulfill its lead bank obligations and immediately exercise the rights and remedies under the loan agreement, including liquidation of the collateral (351,061 units in IRET Properties, a real estate holding company). Crown refused, choosing instead to negotiate secretly with Hoyt and StoneArch IV on behalf of itself, North American, and Citizens. And by design, Crown refused to share these facts with Beal.

7.      Incensed by Beal's refusal to waive Hoyt's default, Crown orchestrated a scheme whereby Crown, North American, and Citizens would be able to punish Beal for its defiance. To facilitate the scheme, Hoyt created Defendant StoneArch IV (taking a 67% ownership and governance interest in it), and used it to purchase all participation interests on his loan except those owned by Beal.

8.      Where did StoneArch IV get the funds necessary to purchase the loan interests of Crown, North American, and Citizens, with an unpaid principal balance of almost $1,300,000? Astonishingly, by a loan for more than $1,300,000 from Crown to StoneArch IV and Hoyt's father, Defendant Bruce K. Hoyt. This loan was not just any loan, but one made at a rate of 3.5%, more than 50% below the rate of the original Hoyt Loan. Further, this loan was made despite Stone Arch IV's obvious dubious financial condition as its initial capitalization was less than $2,000.

9.      As a result of this scheme, Beal received nothing from Crown under the participation agreement while it, North American and Citizens were paid off at par. Although these events transpired in late 2010, Beal did not even receive notice until the scheme was a *fait accompli* in February 2011.

1583619-EA 2

10.    Operating in the darkness created by Crown and knowing nothing about the pending "sale" to the borrower's company, Beal again demanded in October 2010 that Crown, as the lead bank, exercise its rights and remedies and enforce the Hoyt Loan.   Instead of notifying Beal of the sale to Stone Arch IV, Crown's e-mail response planted a false flag and reiterated its request that Beal agree to renegotiate the loan with Hoyt, never mentioning that Crown, North American, and Citizens had already agreed to transfer their participation interests to Stone Arch IV.  Crown went so far as to even accuse Beal of putting Crown, North American, and Citizens in a dire financial predicament by seeking enforcement of the loan's express terms and refusing to renegotiate with Hoyt—all the while knowing that they had already sold Beal down the river.

11.    Simultaneous with closing on the transfer of its participation interests in Hoyt's loan to StoneArch IV, Crown nonetheless continued to receive payments pursuant to the loan: interest payments in the amount of $62,581.59 and distributions from the IRET units held as collateral for the loan in the amount of $55,108.27.  Crown shared no part of those payments with Beal—it certainly did not share 50% of the proceeds with Beal as required by Beal's participation agreement.

12.    Crown had made other loans to Hoyt in addition to the $3,000,000 loan involving the participation agreements.  Adding insult to injury, however, Crown further diluted Beal's interest and security by entering into a loan consolidation agreement with Hoyt on February 10, 2011.  In that agreement, Hoyt acknowledges being in default on the $3,000,000 loan and other obligations to Crown, but Crown "forever and irrevocably releases [Hoyt] from any claims that [Crown] may have for defaults existing prior to" February 10, 2011.  In other words, Crown released all claims arising from Hoyt's default on the loan in which Beal participated.  Once again, Crown furthered its scheme by actively concealing this release from Beal.

1583619-EA 2

13.     Validating Beal's doubts about Hoyt's ability to further service his debt, Hoyt filed for voluntary Chapter 11 bankruptcy protection on May 31, 2011. And, since that time, Stone Arch IV has refused to accept the duties as lead lender and take any affirmative steps in the Hoyt bankruptcy.

14.     Beal is the victim of this sting. Crown and its co-conspirators North American, Citizens, StoneArch IV, and Bruce Hoyt (the father of the borrower, Steve Hoyt) conspired to deprive Beal of the rights, remedies, and benefits of its participation in the Hoyt Loan. Crown and its co-conspirators willfully and intentionally embarked upon a course devised to reward themselves while depriving Beal of the basic rights, remedies, and benefits under its participation agreement acquired by it fairly and at arm's length from the Federal Deposit Insurance Corporation. Crown and its co-conspirators willfully and intentionally concealed and misrepresented material facts about their transactions and dealings with an insolvent and soon-to-be bankrupt borrower. Having diluted Beal's interest and jeopardized Beal's security, Crown eviscerated Beal's rights completely by releasing, irrevocably and forever, any claims of default against Hoyt, misrepresenting material facts to Beal along the way. Henry Gondorff would be proud.

## JURISDICTIONAL STATEMENT

15.     Beal is a Nevada corporation headquartered in Nevada with its principal place of business in Plano, Texas.

16.     Crown is a corporation organized under the laws of the State of Minnesota with its principal place of business located at 6600 France Avenue South, Suite 125, Edina, Minnesota.

17.     Citizens is a corporation organized under the laws of the State of Minnesota with its headquarters and principal place of business located at 111 South 10th Street, Olivia, Minnesota.

18.     North American is a corporation organized under the laws of the State of Minnesota with its headquarters and principal place of business located at 2230 North Albert Street, Roseville, Minnesota.

19.     Bruce K. Hoyt is a Minnesota citizen and a minority owner of StoneArch IV.  He is also the father of Steven B. Hoyt.

20.     StoneArch IV is a limited liability company organized under the laws of the State of Minnesota with its headquarters and principal place of business located at 275 Market Street, Minneapolis, Minnesota.

21.     The members of StoneArch IV are Steven Hoyt, Bruce Hoyt (Steven Hoyt's father), and Anthony J. Navarro, each of whom is a resident and citizen of Minnesota.  Upon information and belief, all members of StoneArch IV are citizens of states other than Nevada and Texas.

22.     This Court possesses subject-matter jurisdiction in accordance with 28 U.S.C. § 1332 because Beal is a corporation incorporated under the laws of Nevada, with its nerve center, headquarters, and principal place of business in Texas; Crown, Citizens, North American, and StoneArch IV are incorporated under the laws of Minnesota, with their nerve centers, headquarters and principal places of business in Minnesota; Bruce K. Hoyt is a citizen of Minnesota; and the matter in controversy, exclusive of interest and costs, exceeds $75,000.

23.     This Court has personal jurisdiction over Crown, Citizens, North American, and StoneArch IV because each entered into certain credit agreement contracts within Minnesota

arising out of a $3,000,000 Term Promissory Note originated by Crown on or about February 28, 2007, designated as Steven B. Hoyt Loan #***0397 (hereinafter, the "Hoyt Loan"). This Court also has personal jurisdiction over Bruce K. Hoyt because he participated in a conspiracy that took place in Minnesota and deprived Beal of the benefits of its 50% undivided interest in the Hoyt Loan.

24.     Venue in this Court is proper in accordance with 28 U.S.C. § 1391(a) because the events or omissions giving rise to this action or a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

## FACTUAL ALLEGATIONS

**A.     The Term Promissory Note—Steven B. Hoyt Loan #***0397.**

25.     On or about February 28, 2007, Hoyt delivered to Crown a fully executed Term Promissory Note, the "Hoyt Loan," attached hereto as **Exhibit A**.

26.     Under the terms of the Hoyt Loan, Hoyt promised to repay the principal sum of $3,000,000, together with monthly interest, in full by February 29, 2008.

27.     As security for the Hoyt Loan, Hoyt originally pledged 354,561 Limited Partnership Units in IRET Properties owned by him and evidenced by Certificate No. 1546. Through a series of transactions, the number of IRET Properties units pledged as security for the Hoyt Loan was reduced to only 327,010.287 units represented by IRET Properties Certificate Nos. 1628 (297,858.000 units) and 1633 (29,152.287 units).

28.     Under the terms of the Hoyt Loan, an Event of Default would occur upon, but not be limited to, the occurrence of, Hoyt's "fail[ure] to perform any of his obligations under his Note."

1583619-EA 2

**B.      The Loan Participation Agreements.**

29.      Contemporaneously with the execution of the Hoyt Loan, on or about February 28, 2007, Crown and BankFirst entered into a Participation Agreement.

30.      On July 17, 2009, the South Dakota Division of Banking closed BankFirst, and Federal Deposit Insurance Corporation ("FDIC") was named receiver.  Pursuant to a Loan Sale Agreement with FDIC dated July 17, 2009, Beal acquired all rights and interests in BankFirst's loan participation agreements.

31.      The BankFirst participation agreement that Beal acquired (hereinafter, the "Beal Participation Agreement," attached hereto as **Exhibit B**), reads, in part, as follows:

> 1.      Sale and Purchase.   **The Lead Bank hereby sells and the Participant hereby purchases an undivided interest in and to the Loan and in the collateral for the Loan** in an amount equal to the Participant's Participation Percentage as stated on Exhibit "A."  The Participant shall share proportionately in all future payments received from the Borrower . . .  and shall be proportionately secured by any collateral and the provisions of any loan documents between the Lead Bank and the Borrower   . . . ("the Loan Documents").  The proceeds of any collation, liquidation, or disposition of collateral shall  . . .  be applied, first, to the payment of interest on the Loan, and next to the payment of principal on the Loan.
>
> **Upon receipt by the Lead Bank of verifiable payment on behalf of the Borrower, the Lead Bank agrees to remit the Participant's proportional share of that payment . . . to the Participant by Noon Central Time the following day.** (Beal Bank Participation Agreement at 1, ¶ 1, emphasis added.)
>
> * * *
>
> Participant's Consent.  **Lead Bank may not take any of the following actions without the Participant's prior written consent:** . . . **(2) waive any payment of principal or interest on the Loan, (3) waive or extend either the due date of any payment owing by Borrower or the maturity of the Loan[.].**
>
> **Lead Bank may not take any of the following actions without the prior written consent of the beneficial holders of more than 50% of**

1583619-EA 2

**the principal balance of the Loan:** (1) release or substitute a material portion of Collateral, (2) **release any** guarantee or guarantor, **liability of any party under the Loan, or the claims of Lead Bank or Participant under the Loan, which release would have a material effect on the repayment or collectability of the Loan, (3) amend, modify, or agree to amend or modify the Loan Documents.** (Beal Bank Participation Agreement at 2, ¶ 6, emphasis added.)

\* \* \*

7.      Event of Termination.

\* \* \*

**The Lead Bank will not, whether before or after an Event of Termination, take any action which does not affect it and each of its participants in like fashion, in a manner commensurate with the proportionate shares of each.** (Beal Bank Participation Agreement at 2, ¶ 7, emphasis added.)

32.     Under the Beal Participation Agreement, Crown received $1,500,000 in exchange for the undivided 50% interest in the $3,000,000 Hoyt Loan Beal acquired. (*See* Exhibit B.)

33.     Separately, but on or about the same date, Crown also entered into Participation Agreements with Defendants Citizens and North American, each for an undivided 16.666% interest of the $3,000,000 Hoyt Loan, or $500,000 each.

34.     Following the execution of these three Participation Agreements in February 2007 and after Beal acquired its interest in the Participation Agreement, the parties' respective allocations of participation in the Hoyt Loan were as follows:

| **Bank** | **Percentage Share** | **Dollar Value** |
|---|---|---|
| Beal | Undivided 50% Interest | $1,500,000 |
| Crown | Undivided 16.666% Interest | $500,000 |
| Citizens | Undivided 16.666% Interest | $500,000 |
| North American | Undivided 16.666% Interest | $500,000 |

1583818-EA 2

35. Crown accepted and never contested Beal's acquisition of BankFirst's participation interest in the Hoyt Loan from the FDIC as Receiver. In fact, Crown President Kevin Howk and Crown Chief Credit Officer Al Doering both testified under oath that Crown treated Beal as a participant of an undivided 50% interest in the Hoyt Loan. (See Exhibit C, K. Howk sworn testimony at 122:2-123:15; Exhibit D, A. Doering sworn testimony at 20:5-18, Exhibit E, Nov. 3, 2010 email from A. Doering to S. Dotson and other participants.)

36. Hoyt defaulted on the Hoyt Loan on or about June 30, 2010 when it matured by failing to pay all outstanding amounts then due and owing pursuant to its terms.

37. Thereafter, and on several occasions, Crown asked Beal to extend and/or renew the terms of the Hoyt Loan. Beal, as per its rights under the participation agreement, did not give its consent as it did not believe the Hoyt Loan merited an extension or renewal—a view which proved correct because Hoyt filed a voluntary petition for Chapter 11 bankruptcy on May 31, 2011.

**C.      The Sham "Loan Purchase and Sale Agreement."**

38. On or about February 11, 2011, Defendants Crown, Citizens, North American and StoneArch IV closed on a "Loan Purchase and Sale Agreement" (attached hereto as Exhibit F). Crown and its co-conspirators agreed that the "Loan Purchase and Sale Agreement" would retroactively take effect October 14, 2010. None of them notified Beal of the Loan Purchase and Sale Agreement.

39. Although Crown claims that it has divested its rights and interest in the Hoyt Loan, including its servicing of the Hoyt Loan, Crown's conduct and sworn testimony belie its claims. On August 11, 2011, Crown sent Beal invoices relating to Crown's continuing expenses incurred in servicing the Hoyt Loan. (See Exhibit G.). In sworn testimony provided by Hoyt,

Hoyt explained: "My understanding is that Crown services that loan for Beal." (See Exhibit H, S. Hoyt sworn testimony at 38:18-19, emphasis added; see also id. at 36:22-37:3.)

40.     Under the terms of the "Loan Purchase and Sale Agreement," Crown, Citizens, and North American transferred their respective interests in the Hoyt Loan to StoneArch IV without any discount. In other words, they received everything they put into the loan transaction. Beal received nothing from the "Loan Purchase and Sale Agreement" and did not know anything about it before it was consummated.

41.     Hoyt is the 67% majority owner of StoneArch IV and, therefore, controls StoneArch IV. Crown knew or should have known these facts prior to consummating the "Loan Purchase and Sale Agreement" because, for example, Crown possessed StoneArch IV's Member Control Agreement that expressly states that Hoyt possesses a 67% "Governance Interest" and 67% "Financial Interest" in StoneArch IV. Neither Crown nor its co-conspirators notified Beal about Steven Hoyt's role in StoneArch IV, but instead actively, intentionally and fraudulently concealed that information from Beal.

42.     Crown was in a superior position to know these facts as compared to Beal; Crown knew that Beal did not have access to these material facts or reason to suspect these facts, and Crown intentionally concealed these facts from Beal.

43.     Crown's intentional concealment of these and other material facts from Beal promoted Crown's scheme with Hoyt, Bruce K. Hoyt (Steven Hoyt's father), StoneArch IV, Citizens, and North American, and facilitated: (A) Crown's appropriation of more collateral and additional security for its other loans with Hoyt and/or entities owned/controlled by Hoyt; (B) Crown's intentional diversion of money due and owing to Beal in a manner that would allow Hoyt to retain a portion for his own use and to pay interest on other loans held by Crown

1583619-EA 2

(including loans in which Citizens and North American owned participation interests); and (C) Crown's knowing or reckless enhancement of Hoyt's position to enable him to negotiate a purchase of Beal's participation interest in the Hoyt Loan at a steep discount, to avoid or delay making payments on the Hoyt Loan that would result in disbursement of money to Beal, and/or to keep the IRET units pledged as collateral and associated quarterly distributions of approximately $55,000 per quarter (hereinafter "the scheme").

44.     In furtherance of the scheme, Crown loaned StoneArch IV and Bruce K. Hoyt a total of $1,375,000 for the express purpose of financing the transfer to StoneArch IV of the Hoyt Loan interests held by Crown, Citizens, and North American under the "Loan Purchase and Sale Agreement," despite Crown's actual knowledge both that StoneArch IV was insolvent and that Hoyt controlled StoneArch IV. Crown's desire to harm Beal is evident from the fact that its loan to Stone Arch IV was at a "friendly" rate nearly 50% less than its other loans to Hoyt.

45.     Emboldened by the hospitable credit environment that emerged from the scheme, Hoyt tried to purchase Beal's undivided 50% interest in the Hoyt Loan for a "fire sale" price. On February 15, 2011, StoneArch IV sent correspondence on its letterhead and signed by Anthony J. Navarro, to a representative of Beal offering to purchase Beal's undivided 50% interest of $1,500,000 in the Hoyt Loan for just $600,000. A true and correct copy of StoneArch IV's February 15, 2011 letter to Beal is attached hereto as Exhibit I. Beal rejected the offer.

46.     Pursuant to a subpoena issued to Crown in Hoyt's bankruptcy proceedings, Crown finally produced to Beal various documents entitled "Crown Bank Loan Accounting System Paid Note Statement" that purport to provide an accounting for the Hoyt Loan. (See Exhibit J.) These Paid Note Statements lay bare the elements of the scheme, the transactions undertaken and payments received by Crown relating to the Hoyt Loan, and the material facts

concealed by Crown and its co-conspirators from Beal after Beal obtained its undivided 50%

participation interest. For example:

a.   A Paid Note Statement that was "Processed Thru: 02/16/2011" demonstrates that on February 11, 2011 a "PAYDOWN FROM NOTE 4101499" (*i.e.*, the Bruce Hoyt Loan) was credited to the Hoyt Loan account in a total amount of $412,500.00 and that a "PAYDOWN FROM NOTE 4101523" (*i.e.*, the StoneArch IV Loan) was credited to the Hoyt Loan account in the total amount of $962,500.00.  To the extent these entries represent "payments" under the terms of the Beal Participation Agreement, Beal never received any portion of these payments totaling $1,375,500.  This $1,375,000 amount was instead retained solely by Crown and/or was shared by Crown with Citizens and North American.

b.   The Paid Note Statement that was "Processed Thru: 02/16/2011" also demonstrates that on February 11, 2011 an "INTEREST PAYMENT FROM NOTE 4021044" was credited to the Hoyt Loan account in the total amount of $62,581.59—and none of it has ever been paid to Beal. (*See, e.g.*, A. Doering sworn testimony at 79:5-80:23.)

47.   Crown's decision not to pay Beal its share of this $62,581 interest payment

and/or other payments credited to the Hoyt Loan account) was part of the scheme and an

intentional interference with Beal's 50% undivided ownership rights under the Beal Participation

Agreement, including but not limited to its interest in all payments.

48.   On or about December 22, 2010, Crown contacted IRET Properties to notify it

that Hoyt had defaulted on the Hoyt Loan, to direct that all future distributions from the IRET

units held as collateral should go directly to Crown, and to initiate a process of converting those

IRET units into IRET shares to liquidate the collateral and satisfy Hoyt's obligations under the

Hoyt Loan.

49.   On January 13, 2011, Crown received two checks from IRET Properties totaling

$55,108.27 representing distributions from the IRET units held as collateral for the Hoyt Loan.

(*See* **Exhibit K**, Jan. 13, 2011 correspondence and attached copies of checks.)  Crown concealed

from Beal its receipt of this $55,108.27 distribution and never paid to Beal any portion of it.  (A. Doering sworn testimony at 66:4-21, 71:7-11.)

50.     Crown either retained this amount and/or distributed it to StoneArch IV and/or Hoyt intentionally to interfere with Beal's ownership rights under the Beal Participation Agreement and in furtherance of Crown's scheme.

51.     Crown's scheme continued to metastasize with a "Loan Consolidation Agreement" dated February 10, 2011, between Crown and StoneArch IV.   Pursuant to that agreement, "The collateral transferred to StoneArch Fund IV, LLC in connection with the sale of Note No. ***0397 to StoneArch Fund IV, LLC shall include $55,108.27 in distributions received by the Bank on or about January 13, 2011 from IRET Properties on account of collateral for Note No. ***0397."  (**Exhibit L** at 2, ¶ 7.)  Crown's Chief Credit Officer, however, testified that Crown placed the $55,108.27 in a "lender controlled account" in the name of Steven Hoyt.  (A. Doering sworn testimony at 66:4-68:12.)  Crown's President, Kevin Howk, testified, in contrast, that Crown deposited the $55,108.27 in IRET distributions into an escrow account.  (K. Howk sworn testimony at 129:12-130:16).  Crown's story continues to blur.

52.     As a condition of the February 10, 2011 "Loan Consolidation Agreement" between Hoyt and Crown, the parties agreed:

> Upon completion of the sale of Note ***0397 to StoneArch Fund IV, LLC, the Bank will notify IRET Properties that the Bank has withdrawn its request for distributions from, or the exchange or conversion of, Borrower's interests in IRET Properties. (Exhibit L at 2, ¶ 7.)
>
> * * *
>
> **The Bank hereby forever and irrevocably releases the Borrowers from any claims that the Bank may have for defaults existing prior to the date of this Agreement under the [Hoyt Loan].** (Exhibit L at 3, ¶ 10, emphasis added.)

1583619-EA 2

53.    Crown knew or should have known, when it entered the Loan Consolidation Agreement with Hoyt, that: (A) the Hoyt Loan subject to the Beal Participation Agreement had fully matured over 6 months before, on June 30, 2010; (B) Crown had declared Hoyt in default; (D) the $1.5 million participation interest of Beal was due and payable under the express terms of both the February 29, 2008 Term Promissory Note and the Beal Participation Agreement; and (D) StoneArch IV was insolvent and Hoyt was struggling financially and close to insolvency himself.

54.    On March 1, 2011—after Crown claimed it no longer held any participation or other interest under the Participation Agreement—Crown's attorney sent correspondence to IRET Properties on behalf of Crown directing as follows:

> In previous correspondence we have requested on behalf of the Bank that all distributions that became payable to Mr. Hoyt on account of the IRET Collateral be paid to Crown Bank and that the IRET Collateral be exchanged into IRET shares. Please accept this letter as a formal withdrawal by the Bank of both these requests.

(**Exhibit M**, Mar. 1, 2011 correspondence from K. Busch, Esq. to M. Bosch of IRET Properties.)

55.    When Crown through its legal counsel sent this letter, Crown knew or should have known the Hoyt Loan continued to be in default and that Beal possessed a direct 50% undivided participation interest requiring payment to Beal within 24 hours, but proceeded to send the letter as a material component of the scheme.

56.    When Crown through its legal counsel sent this letter, Crown knew or should have known that the Consent to Pledge of Partnership Interest was an agreement in which Crown, as holder of pledged certificates, gave Crown the right to require all IRET dividends to be paid to Crown as Lead Bank as part of its default-enforcing rights. Crown possessed actual knowledge that Beal owned an undivided 50% interest in this document as one of the Loan

Documents in which Crown had transferred an interest.  Having exercised those rights to have distributions paid to Crown as Lead Bank, as requested by Beal, that direction and perfection of a lien position could not be rescinded under the Beal Participation Agreement without approval of more than 50% of the participants.  Beal never agreed to rescind that demand for payment of distributions.  Crown's intentional actions despite Beal's non-agreement materially breached the Beal Participation Agreement.

57.    As a result of Crown's March 11, 2011 letter to IRET sent by Crown's legal counsel, Hoyt received quarterly distributions of approximately $55,000 each on the IRET Units held as collateral for the Hoyt Loan in both April 2011 and July 2011.  Although the Hoyt Loan was still in default, Hoyt received over $110,000 in IRET distributions thanks to the actions of Crown and its legal counsel.  Beal received none of it.

58.    Pursuant to Crown's scheme, Hoyt could use the approximately $110,000 in IRET Properties distributions to pay interest on the Crown loans to StoneArch IV ($962,500) and Bruce Hoyt ($412,500) used to finance the "purchase" of all participation interests (except Beal's) by StoneArch IV.

59.    As a result of the participation interests that Citizens and North American hold in Crown's loan to StoneArch IV, they also received a portion of these and other distributions from the IRET units held as collateral for the Hoyt Loan.  These payments motivated Citizens and North American to join in Crown's scheme as a way to soften or mitigate the adverse financial consequences they suffered as a result of Hoyt's default.

60.    IRET Properties will, upon information and belief, continue in the future to make $55,000 quarterly distributions on the IRET units held as collateral, and Hoyt will continue to

1583619-EA 2

receive those distributions, to the exclusion of Beal, thanks to the scheme perpetrated by Crown and its co-conspirators–unless the Court puts an end to it.

61.     Hoyt filed a voluntary petition for Chapter 11 bankruptcy on May 31, 2011, before the United States Bankruptcy Court for the District of Minnesota, Case 11-43816 (the "Case").   In furtherance of the scheme concocted by Crown and its co-conspirators, neither Crown nor StoneArch IV has taken any action in the Case to protect the interests of Beal with regard to the Hoyt Loan.

62.     Neither Crown nor StoneArch IV, for instance, has filed in the Case a motion for relief from the automatic stay of 11 USC § 362 or an objection to Hoyt's motion for use of cash collateral even though:   (A) substantially all of the cash collateral to be used by Hoyt for personal expenses and payments to Crown of sums due Crown on obligations other than the Hoyt Loan are from the IRET distributions securing the repayment of the Hoyt Loan; (B) the value of the IRET units securing repayment of the Hoyt Loan has declined significantly since the commencement of the Case; (C) Hoyt has not pursued adequate protection of Beal's interest in the Hoyt Loan in connection with his proposed use of IRET distributions securing the repayment of the Hoyt Loan; and (D) Hoyt has not proposed any adequate protection of Beal's interest in the Hoyt Loan against the continued decline in the value of the IRET units securing repayment of the Hoyt Loan.

1583619-EA 2

**D.      Impact of Crown's Misconduct**

63.      Crown violated duties owed to Beal because Crown knew or should have known that Beal's 50% undivided ownership interest in the Hoyt Loan was at the very least, severely compromised by StoneArch IV and in all probability now has a greatly discounted value. (*See* K. Howk sworn testimony at 77:21-79:4; *see also* **Exhibit N**.)

    a.      Indeed, by placing StoneArch IV in such a beneficial position, Crown was able to negotiate lucrative terms, including substantial additional collateral on Crown's consolidation of all Hoyt's other loans with Crown, including but not limited to, "IRET Properties Certificate Nos. 1628 and 1633." (*See* Exhibit L, Feb. 10, 2011 Loan Consolidation Agreement between Crown and Steven B. Hoyt at 2, ¶ 8 and attached promissory note.)

    b.      Crown had recently learned that the collateral supporting a separate $2.0 million loan to Steven Hoyt was essentially worthless. (A. Doering sworn testimony at 105:3-9; 22:11-23:13.) Therefore, Crown was desperate to obtain security for that loan—even if it meant breaching duties owed to Beal with respect to the Hoyt Loan.

64.      Crown violated duties owed to Beal by funding one or more loans to third-parties (*e.g.*, StoneArch IV and Bruce K. Hoyt) in order to facilitate a "sale," at par value, to StoneArch IV of the participation interests in the Hoyt Loan of everyone but Beal.

65.      Crown violated duties owed to Beal because Crown knew, or should have known, that Hoyt was trying to leverage a purchase of Beal's participation interest in the Hoyt Loan at a steep discount by manipulating circumstances in a manner that would provide him greater leverage for negotiating a steep discount. (*See, e.g.,* Exhibit N.) Indeed, Crown provided Hoyt and StoneArch IV with a copy of Crown's Participation Agreement governing Beal's participation interests in the Hoyt Loan. (K. Howk sworn testimony at 72:8-73:23.)

a.    helping to facilitate the circumstances that would be used by Hoyt in an attempt to leverage an unfair, steep discount from the purchase price of Beal's participation interests in the Hoyt Loan. (*See* K. Howk sworn testimony at 62:12-63:23; *see also* A. Doering sworn testimony at 99:1-100:5.)

b.    Contrary to the terms of the Beal Participation Agreement, Crown's treatment of Beal in this respect was vastly different from the treatment of the other participants in the Hoyt Loan who were provided with timely and correct information, and with whom Crown worked cooperatively in order to assure that each of those other participants would receive par value, plus interest, for the sale of their participation interests.

66.    Pursuant to Crown's February 10, 2011 "Loan Consolidation Agreement" with Hoyt, Crown agreed to withdraw its acceleration notice on the over-due Hoyt Loan that was in default and in which Beal possesses an undivided 50% ownership interest (Exhibit L at 2, ¶ 4), and therefore violated duties owed to Beal because Crown knew that all of the participation interests in the Hoyt Loan would be transferred to StoneArch IV the next day and that this would only disadvantage Beal because the borrower of the Hoyt Loan controlled StoneArch IV.

67.    Crown violated the duties it owed to Beal by agreeing in its February 10, 2011 "Loan Consolidation Agreement" with Hoyt: "The Bank hereby forever and irrevocably releases the Borrower from any claims that the Bank may have for defaults existing prior to the date of this Agreement under the [the Hoyt Loan]." (Exhibit L at 3, ¶ 10.) Accordingly, Crown, while acting as the lead lender, purported to release Hoyt from all defaults under the Hoyt Loan as of February 10, 2011—even though the Hoyt Loan had matured in June of 2010, the Hoyt Loan had never been extended beyond the maturity date, the Hoyt Loan had been declared in default, and Crown and all other participants except Beal would have their interests in the loans paid off the following day through a sham "sale" designed to allow those other banks to remove the non-performing Hoyt Loan off their books and which would provide great benefits to those banks including, for example, increasing the lending limits and liquidity for each of those banks.

1583619-EA 2

68.     Crown violated duties owed to Beal because Crown's February 10, 2011 "Loan Consolidation Agreement" with Hoyt provided significant additional collateral that further secured repayments of the amounts that had been loaned to Hoyt through the participation interests of Crown, Citizens, and North American in the Hoyt Loan—which were re-loaned to StoneArch IV through the scheming of Crown. (Exhibit L at 2-3, ¶ 8.)

69.     Crown violated duties owed to Beal by loaning large sums of money to Hoyt in February 2011 for the purpose of having Hoyt pay past due interest on the Hoyt Loan, but then not paying any portion of those interest payments to Beal as required by the express terms of the Beal Participation Agreement.

70.     Crown violated duties it owed to Beal by making loans to StoneArch IV and Bruce K. Hoyt to facilitate Crown's scheme and making those loans at below-market interest rates, substantially below the interest rate originally charged on the Hoyt Loan, and on terms that were inconsistent with, or contrary to, safe and sound lending practices.

71.     The actions taken by Crown and others, as described above, were made with the actual intent to, and in fact did have the effect of, hindering, delaying and interfering with Beal's ability to collect the money owed to it as an owner of an undivided 50% interest in the Hoyt Loan, and otherwise were intended to defraud Beal as a creditor of both Crown and Hoyt.

## COUNT I:  BREACH OF BEAL PARTICIPATION AGREEMENT
### (Against Crown)

72.     Beal realleges and incorporates by reference the allegations contained in Paragraphs 1 through 71 above.

73.     The Beal Participation Agreement is a valid, enforceable contract between Crown and Beal.

74.     Beal has fully performed its obligations under the Beal Participation Agreement.

75.     Crown has unjustifiably failed and refused, and continues to unjustifiably fail and refuse, to perform its obligations owed to Beal under the Beal Participation Agreement, for example, as follows:

a.      Failing to remain the "Lead Bank" as that term is defined in the Beal Participation Agreement;

b.      Failing to share proportionately with Beal in all payments received;

c.      Failing to maintain Beal's proportionate share of security in all collateral;

d.      Failing to refrain from any action which does not affect Crown and each of its participants in like fashion, in a manner commensurate with the proportionate share of each.

e.      Concealing from Beal that it was negotiating a sale of all other participants' interests in the Hoyt Loan at par, plus interest (*see* K. Howk sworn testimony at 62:12-63:23; *see also* A. Doering sworn testimony at 99:1-100:5), despite recognizing that "it's important to provide communications to its participants as to any significant events that are occurring." (*See* K. Howk sworn testimony at 55:17-23.)

f.      Failing to obtain additional collateral to secure the repayment obligation for Beal's participation interest, but instead negotiating a loan to StoneArch IV and Bruce K. Hoyt (Steven Hoyt's father) representing substantially the same loan obligation owed to Crown under the Hoyt Loan and entering into a "Security Agreement" with StoneArch IV encompassing use of the Hoyt Loan (and the IRET units serving as collateral for the Hoyt Loan) as security for Crown's loan to StoneArch IV.

g.      Paying Beal none of Beal's 50% undivided interest in the $55,108.27 in distributions received from IRET, or in any additional IRET distributions it received either directly or indirectly. Indeed, Crown's President testified that because there was a pending sale (or at least negotiations) with StoneArch IV of all the participation interests (except for Beal's), this $55,108.27 was put into an escrow account rather than disbursed to the participants. This was all done despite Crown's President's admission that he knew under the Beal Participation Agreement that Beal was entitled to 50% of the IRET distribution payments. (*See* K. Howk sworn testimony at 130:9-131:19.)

1583819-EA 2

    h.     To the extent the $1,433,265.52 "PAYOFF" or other "PAYDOWN," "PRINCIPAL DECREASE," "INTEREST DECREASE," or "INTEREST PAYMENT" on February 11, 2011, qualify as "payments" under the terms of the Beal Participation Agreement, Crown breached the Agreement by paying Beal none of its 50% undivided interest in those payments.

76.    Crown's failure to perform the above-described obligations, as well as its failure to perform other obligations as may be discovered in the course of litigation, constitute material breaches of the Beal Participation Agreement by Crown, violation of duties owed by Crown to Beal, and/or willful misconduct by Crown.

77.    In addition, Crown has breached the Beal Participation Agreement and/or committed willful misconduct, among other ways, by taking the following actions:

    a.     Without Beal's consent, waiving payment and/or failing or refusing to recover payment of principal and/or interest on the Hoyt Loan;

    b.     Without Beal's consent, waiving and/or failing or refusing to enforce the due date of payment on the Hoyt Loan;

    c.     Without Beal's consent, effectively extending the due date of payment on the Hoyt Loan;

    d.     Without Beal's consent, waiving and/or failing or refusing to enforce the maturity of the Hoyt Loan;

    e.     Without Beal's consent, "forever and irrevocably releas[ing] [Hoyt] from any claims that the Bank may have for defaults existing prior to the date of this [Loan Consolidation] Agreement under the [Hoyt Loan]."

    f.     Without Beal's consent, effectively extending the maturity of the Hoyt Loan; and

    g.     Receiving distributions and/or dividends from the IRET units held as collateral and failing to pay a pro rata share of those proceeds to Beal.

78.    Indeed, many of Crown's actions were not just done without Beal's consent; they were done contrary to Beal's specific objections to Crown.

1583619-EA 2

79.     As a direct and proximate result of Crown's breaches of the Beal Participation Agreement and/or Crown's willful misconduct, Beal has suffered and continues to suffer damages in an amount to be determined at the time of trial but which is reasonably believed to greatly exceed $75,000.

## COUNT II:  BREACH OF IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING
### (Against Crown)

80.     Beal realleges and incorporates by reference the allegations contained in Paragraphs 1 through 79 above.

81.     By virtue of their participation in the Beal Participation Agreement, an implied covenant of good faith and fair dealing exists between Crown and Beal.

82.     As a result of this implied covenant of good faith and fair dealing, Crown was prohibited from failing or refusing to fulfill its duties or contractual obligations based upon an ulterior motive, evading the spirit of the Beal Participation Agreement, and/or abusing its power under the Beal Participation Agreement.

83.     By entering the "Loan Purchase and Sale Agreement" and selling the Hoyt Loan to StoneArch IV, and the other actions of Crown described in detail above, Crown destroyed and/or substantially impaired Beal's right to recover its principal and any accrued interest and other payments due on the Hoyt Loan, thereby breaching the implied duty of good faith and fair dealing.

84.     As a direct and proximate result of Crown's breach of the implied duty of good faith and fair dealing and/or willful misconduct, Beal suffered and continues to suffer damages in an amount to be determined at the time of trial but which is reasonably believed to greatly exceed $75,000.

1583619-EA 2

## COUNT III:  TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Citizens, North American, StoneArch IV, Bruce Hoyt and Crown)

85.    Beal realleges and incorporates by reference the allegations contained in Paragraphs 1 through 84 above.

86.    The Beal Participation Agreement is a valid, enforceable contract between Crown and Beal.

87.    Citizens, North American, StoneArch IV, and Bruce K. Hoyt each had knowledge of the Beal Participation Agreement prior to procuring Crown's breach of that agreement.

88.    Citizens, North American, and StoneArch IV intentionally procured Crown's breach of the Beal Participation Agreement, by among other things, entering into the "Loan Purchase and Sale Agreement" and depriving Beal of its rights under the Beal Participation Agreement

89.    Bruce K. Hoyt intentionally procured Crown's breach of the Beal Participation Agreement, by among other things, agreeing to borrow $412,500 dollars from Crown so that it could be used by StoneArch IV, an entity controlled by his son, Steven B. Hoyt, solely to fund the transfer of interests in the Hoyt Loan and deprive Beal of its rights under the Beal Participation Agreement.

90.    By entering into the transaction involving the "Loan Purchase and Sale Agreement," Citizens and North American received payment in excess of their respective proportionate participation interests, while Beal received no payment.

91.    By entering into the "Loan Purchase and Sale Agreement," StoneArch IV and Crown intentionally interfered with Beal's rights and interest in the Hoyt Loan.  Bruce K. Hoyt new about this plan, actively participated in it by contributing at least $412,500 towards the

1583819-EA 2

transfer, and ratified these actions by being a co-owner of StoneArch IV and participating in the plan as discussed above, which included signing: (1) StoneArch IV's $962,500 promissory note to Crown, and (2) a Security Agreement pursuant to which StoneArch IV granted Crown a security interest in the Hoyt Loan as well the IRET units serving as collateral for the Hoyt Loan (*i.e.*, Certificate Nos. 1628 and 1633).

92.     The intentional procurement of Crown's breach of the Beal Participation Agreement by Citizens, North American, StoneArch IV, and Bruce K. Hoyt was without justification.

93.     Crown has repeatedly represented to Beal that it intentionally transferred the servicing obligations under the Hoyt Loan to StoneArch IV.   To the extent that Crown transferred all its rights and obligations under the Participation Agreement to StoneArch IV through the "Loan Purchase Agreement," including the servicing obligations, Crown intentionally interfered with Beal's contractual rights under the Beal Participation Agreement, without justification, through its subsequent conduct which intentionally deprived Beal of the rights Beal was entitled to under the Beal Participation Agreement.

94.     If Crown did in fact transfer its servicing obligations, then it intentionally interfered with Beal's contractual rights under the Beal Participation Agreement by, for example, instructing IRET Properties as of March 1, 2011, to redirect payment of distributions to Hoyt and to terminate the process of converting the IRET units into IRET shares to be held in the name of the lead lender. (*See* **Exhibit O**, Jan. 6, 2011 letter from K. Busch of Moss & Barnett on behalf of Crown to M. Bosch of IRET Properties instructing IRET Properties to issue the shares in the name of Crown; *see also* Exhibit M, Mar. 1, 2011 letter from K. Busch of Moss & Barnett on behalf of Crown to M. Bosch of IRET Properties withdrawing Crown's

1583619-EA.2

previous directions to (1) pay all distribution from IRET units held as collateral to Crown and (2) convert IRET units held in Hoyt's name into IRET shares held in Crown's name.)

95.    As a direct and proximate result of the tortious interference of Citizens, North American, StoneArch IV, and Crown, Beal has suffered and continues to suffer damages in an amount to be determined at the time of trial but which is reasonably believed to greatly exceed $75,000.

## COUNT IV: FRAUD AND MISREPRESENTATION
### (Against Crown)

96.    Beal realleges and incorporates by reference the allegations contained in Paragraphs 1 through 95 above.

97.    Crown intentionally and/or recklessly made false representations to Beal about material facts related, but not limited, to the following:  (A) the collateral securing the Hoyt Loan following Hoyt's default on the Hoyt Loan and then following execution of the "Loan Purchase and Sale Agreement;" (B) its role as "Lead Bank," as that term is defined in the Beal Participation Agreement, following the execution of the "Loan Purchase and Sale Agreement;" and (C) the entity, if any, now responsible for servicing the Hoyt Loan following the execution of the "Loan Purchase and Sale Agreement."

98.    Additionally, Crown intentionally and/or recklessly concealed its scheme with Hoyt to transfer all participation interests in the Hoyt Loan—excepts for Beal's—to StoneArch IV for the purpose of depriving Beal from receiving the benefit of its rights under the Beal Participation Agreement.

99.    Crown, through Al Doering, made numerous false and/or misleading representations in communications with Beal, including the communications contained in Al

26

Doering's November 3, 2010 email to S. Renee Dotson representing Beal. (*See* Exhibit E.) For example, in that email Al Doering, the Chief Credit Officer of Crown, falsely represented:

a.  "[W]e are in a position today to start liquidating the stock[.]"

b.  "The best course was and continues to be, renewing the loan with acceptable repayment terms and adding, if possible, additional collateral."

c.  "We have been unable to have serious talks with the borrower regarding these kinds of terms[.]"

d.  "It's possible we could find a buyer at a discounted price[.]"

e.  "[W]e feel it is in everyone's best interest to find a way to restructure and improve this loan that is acceptable to all parties. However, if that can't be done, we are prepared to exchange the maximum [IRET] units and sell those resulting shares on the open market starting this quarter."

100.  Al Doering cc'd other representatives of Crown on this email, including Crown's President and Crown's attorney, as well as representatives from Citizens and North American, but because they were all participants in Crown's scheme, none of them disclosed the truth to Beal.

101.  As of the November 3, 2010 date of Al Doering's email, however, the following facts demonstrate Crown, Citizens, and North American had already agreed to a course of action vastly different than the plan outlined in Al Doering's email to Beal's representative—a secret plan that was consistent with Crown's scheme:

a.  In or before October 19, 2010, Crown's attorneys had already drafted the "Loan Purchase and Sale Agreement. (K. Howk sworn testimony at 62:22-25.)

b.  On October 19, 2010, Crown Vice President Maria Bonnie wrote a letter to StoneArch Fund IV explaining:

i.  I am pleased to inform you Crown Bank, North American Banking Company and Citizens State Bank have agreed to execute the Loan Purchase and Sales Agreement between the Crown Bank, North

1583619-EA 2

American Banking Company, Citizens State Bank ("Sellers") and StoneArch Fund IV, LLC ("Purchaser") for the sale of all Sellers' interests in the Steven B. Hoyt Loan dated February 28, 2007 and Related Documents[.] (*See* **Exhibit P**, Oct. 19, 2010 letter from M. Bonnie to A. Navarro.)

102.    Crown's false representations were made with the willful intent and purpose of defeating, weakening, and/or diluting Beal's lawful rights and interest in the Hoyt Loan, and to frustrate, complicate, delay, and thwart any action that could be taken by Beal on the Hoyt Loan by virtue of the loan being held by StoneArch IV, an entity substantially owned and controlled by the borrower, Hoyt.

103.    Beal reasonably relied on Crown's false representations to its own detriment by, among other things, relying on Crown to enforce the loan obligations against the borrower, Hoyt, in a manner that protected Beal's interests and before Hoyt declared bankruptcy.

104.    Crown had special knowledge of material facts to which Beal did not have access, for example, the financial condition of Hoyt, and their secret plan to loan money to StoneArch IV and Bruce K. Hoyt to finance the purchase of only those interests in the Hoyt Loan that were not owned by Beal.

105.    Crown's confidential and/or fiduciary relationship with Beal both at the time Beal entered into the Beal Participation Agreement and at the time it purportedly sold the Hoyt Loan to StoneArch IV under the "Loan Purchase and Sale Agreement," obligated Crown to make a full disclosure regarding these circumstances as well as the effect of the "Loan Purchase and Sale Agreement" agreement on Beal's rights and interest in the Hoyt Loan.

106.    If Beal had known about Crown's fraud, then, for example, it would have been able to take action including, but not limited to: (A) initiation of action against Crown earlier, before Crown consummated the "sale" of all interest in the Hoyt Loan but Beal's to StoneArch

IV, (B) negotiation of a more favorable resolution for itself than the situation created as a result of Crown's scheme—which has substantially injured Beal; (C) sale of its interests in the Hoyt Loan to StoneArch IV on the same or similar terms as those achieved by Crown, Citizens and/or North American; and/or (D) initiation of action for injunctive or declaratory relief preventing Crown from furthering its scheme.

107.    Crown's fraudulent statements and failures to disclose material information were done either intentionally, willfully, and/or recklessly, and with knowledge that Beal would rely on Crown as the lead lender.

108.    As a direct and proximate cause of Crown's fraud and misrepresentation, Beal has incurred significant injury and damages in an amount to be determined at the time of trial, and which it is entitled to recover and is reasonably believed to exceed $75,000.

## COUNT V:  BREACH OF FIDUCIARY DUTY
### (Against Crown)

109.    Beal realleges and incorporates by reference the allegations contained in Paragraphs 1 through 108 above.

110.    Pursuant to an express, written communication between a senior officer of Crown and a representative of Beal, Crown acknowledged its fiduciary duty owed to participants in the Hoyt Loan to, among other things, maximize recovery of past due amounts owed under the Hoyt Loan.

111.    The affirmation of Crown's fiduciary obligation by a senior officer, in writing, confirmed Crown's role as a fiduciary to Beal and the other participating banks, despite the fact that, by its terms, the Beal Participation Agreement itself did not create such an independent duty.

1583619-EA 2

112.    Beal reasonably reposed trust and confidence in Crown, and reasonably relied on Crown's written representation that it owed a fiduciary responsibility to participating banks in the Hoyt Loan.  Of special importance to Beal was the fact that a senior officer of Crown put this representation in writing to confirm Beal's understanding of the fiduciary duties owed to it after the Hoyt Loan was in default and during active discussions about how Crown, as lead bank, would address that outstanding and past due loan.

   a.    During this same time period, while assuring Beal that Crown would comply with its fiduciary responsibilities owed to the participating banks, Crown also promised, in writing, that if agreement could not be reached regarding a restructuring of the Hoyt Loan, that Crown would promptly begin selling the collateral securing the Hoyt Loan.

      i.    Beal reasonably relied on these written representations made by Crown to its detriment.

      ii.    The Hoyt Loan was not restructured because no agreement could be reached regarding that issue.

      iii.    Rather than promptly selling the collateral as promised, Crown entered into a series of secret transactions with StoneArch IV and Bruce K. Hoyt that resulted in substantial payments to Crown on the Hoyt Loan that were not shared with Beal, despite Beal being an owner of an undivided 50% interest in the Hoyt Loan and being entitled to a "proportional share of that payment" pursuant to paragraph 1 of the Beal Participation Agreement. (*See* Exhibit B at 1, ¶ 1.)

113.    Crown willfully breached its fiduciary duties to Beal, among other ways, by:

   a.    Entering the "Loan Purchase and Sale Agreement" and selling the Hoyt Loan to StoneArch IV, an entity substantially owned and controlled by the borrower, Hoyt;

   b.    Failing or refusing to fully and accurately communicate material information to Beal related to the collateral securing the Hoyt Loan and distributions from that collateral received by Crown;

   c.    Failing or refusing to fully and accurately communicate material information to Beal related to its role as "Lead Bank," as that term is defined in the Beal Participation Agreement, including but not limited to

1583619-EA 2

what entity, if any, is now responsible for servicing the Hoyt Loan following the execution of the "Loan Purchase and Sale Agreement;" and

d.    Failing or refusing to provide a full, complete, accurate, and prompt accounting to Beal of all amounts received as payment and/or "paydown" on the Hoyt Loan, including but not limited to money received from distributions or other payments made in connection with the IRET units held as collateral for the Hoyt Loan.

114.    As a direct and proximate result of Crown's willful breaches of its fiduciary duties to Beal, Beal has suffered and continues to suffer damages in an amount to be determined at the time of trial but which is reasonably believed to greatly exceed $75,000.

## COUNT VI: FRAUDULENT NONDISCLOSURE/CONCEALMENT (Against Crown)

115.    Beal realleges and incorporates by reference the allegations contained in Paragraphs 1 through 114 above.

116.    Crown willfully and/or intentionally concealed material facts regarding, for example, the "Loan Purchase and Sale Agreement" that it had a duty to disclose to Beal, for the express purpose of defrauding Beal as described above.

117.    Crown engaged in further willful and/or intentional concealment of material facts it was under a duty to disclose to Beal when, for example:

a.    Crown concealed who the servicer was on the Hoyt Loan following the transfer to StoneArch IV;

b.    Crown concealed the entire Hoyt Loan file and associated documentation that would have, for example, provided clarity on the transfers discussed above, when Beal specifically and repeatedly asked in writing for an opportunity to personally inspect those documents and make copies of those documents (*see* **Exhibit Q**)

c.    Crown concealed the terms of the February 10, 2011 "Loan Consolidation Agreement" pursuant to which it withdrew its acceleration notice on the Hoyt Loan, released Hoyt from all defaults under the Hoyt Loan, and agreed to numerous other terms that similarly impaired Beal's rights and the ability to promptly collect money owed under the Hoyt Loan.

1583619-EA 2

d.    Crown concealed payments and funds it received on account of the Hoyt Loan, including but not limited to distributions from IRET Properties relating to the IRET units held as collateral and which totaled over $55,000.

e.    Crown concealed who held the collateral securing the Hoyt Loan and informed Beal both that the collateral used to secure the Hoyt Loan was being used by Crown to secure other loans (*i.e.*, not the Hoyt Loan) and that it was still being used to secure the Hoyt Loan.

i.    *See, e.g.,* **Exhibit R**, transcription of July 11, 2011 voicemail message from Crown's attorney explaining, in part as follows: "The other thing you might do is look at a UCC filing that was done by Crown at the Minnesota Secretary of State, document number 201123194543, and you will see in the public record there that we continued to hold a security interest in 2 certificates from IRET Properties. Those are held for other loans, not for the one that in which your client had any participation and that was sold."

f.    Crown concealed its negotiations with StoneArch IV concerning the acquisition of all ownership interests in the Hoyt Loan except for Beal's, as well as concealing the opportunity to sell participation interests in the Hoyt Loan to StoneArch IV on terms different than what Hoyt was otherwise offering.

118.    Beal was unaware of the true nature and specific terms of the "Loan Purchase and Sale Agreement" and any secret side agreements relating to the transfers at issue; they were not disclosed to Beal. Beal was excluded as part of Crown's scheme.

119.    Crown's willful and/or intentional concealment of the true nature of the "Loan Purchase and Sale Agreement" and other critical information regarding the purported sale of the Hoyt Loan to StoneArch IV and other material issues, unfairly impaired and interfered with Beal's ability and rights, for example, to: (A) negotiate with StoneArch IV and/or Steven B. Hoyt on a level playing field; (B) bring an immediate action to enjoin the "Loan Purchase and Sale Agreement" from occurring and seeking recovery against Steven B. Hoyt personally on equitable principles (or other theories) prior to Steven B. Hoyt filing for bankruptcy; (C) immediately request information and documents from Crown as set forth under the terms of

1583619-EA 2

the Beal Participation Agreement; and (D) enforce its current and prospective rights to payments and proceeds made on account of the Hoyt Loan before they were transferred to third-parties or otherwise impaired.

120.    As a direct and proximate cause of Crown's intentional and/or willful fraudulent concealment and non-disclosure, Beal has incurred significant injury and damages in an amount to be determined at the time of trial but which is reasonably believed to greatly exceed $75,000.

## COUNT VII: CONVERSION
### (Against Crown, Citizens and North American)

121.    Beal realleges and incorporates by reference the allegations contained in Paragraphs 1 through 120 above.

122.    Without permission or lawful authority, Crown, Citizens, and North American intentionally took and/or possess money that rightfully belongs to Beal as a 50% owner of all payments, proceeds, collateral and distributions relating to the Hoyt Loan as set forth in more detail in the Beal Participation Agreement.

123.    The actions of Crown, Citizens, and North American with respect to Beal's rights and interest in the Hoyt Loan, including but not limited to payments and proceeds credited to the Hoyt Loan, willfully and unlawfully interfere with Beal's rights and interest in the Hoyt Loan without justification.

124.    For example, Crown, Citizens and North American have intentionally and/or willfully deprived Beal of payments and/or other monies received and/or credited to the Hoyt Loan account, as well as disbursements from the IRET units an serving as collateral to secure the Hoyt Loan and have, therefore, committed the tort of conversion

125.    Due to their conversion, Crown, Citizens, and North American have deprived Beal from the use, possession, and enjoyment of such money and collateral and Beal has been

1583619-EA 2

proximately damaged.

126.    Beal is entitled to damages caused by Crown, Citizens, and North American's

conversion in an exact amount to be determined at the time of trial, but which is reasonably

believed to exceed $75,000.

## COUNT VIII:  CONSTRUCTIVE TRUST
### (Against Crown)

127.    Beal realleges and incorporates by reference the allegations contained in

Paragraphs 1 through 126 above.

128.    A confidential relationship exists between Crown and Beal arising out of, among

other things, the Beal Participation Agreement and Crown's affirmation of the fiduciary

obligations it owes to Beal.

129.    Through this confidential and fiduciary relationship, Crown acquired an

advantage it should not, in equity and good conscience, retain.

130.    By virtue of Crown's advantage, Beal is entitled to a constructive trust in its rights

and interest in the Hoyt Loan as set forth in the Beal Participation Agreement, including all

collateral that was pledged to secure the Hoyt Loan, as well as all proceeds and other payments

received on account of the Hoyt Loan or through Crown's sham "Loan Purchase and Sale

Agreement."

## COUNT IX: BREACH OF CONTRACT
### (Against StoneArch IV)

131.    Beal realleges and incorporates by reference the allegations contained in

Paragraphs 1 through 130 above.

132.    To the extent StoneArch IV became the lead lender and/or possessed the servicing

rights and obligations with respect to the Hoyt Loan as a result of one or more transactions with

1583619-EA 2

Crown, StoneArch IV breached both the Beal Participation Agreement and the implied covenant of good faith and fair dealing contained in that agreement.

133.    The Beal Participation Agreement is a valid and enforceable contract between StoneArch IV and Beal pursuant to which, among other things, StoneArch IV owes Beal duties of good faith and fair dealing.

134.    Beal has fully performed its obligations under the Beal Participation Agreement.

135.    StoneArch IV has unjustifiably failed and refused, and continues to unjustifiably fail and refuse, to perform its obligations owed to Beal under the Beal Participation Agreement, by, for example:  (A) failing to file a motion for relief from the automatic stay of 11 USC § 362 in the Hoyt voluntary bankruptcy case; (B) failing to object to Hoyt's motion of the use of cash collateral in the Hoyt voluntary bankruptcy case; and (C) refraining from any action (or inaction) which does not affect it and each of its participants in like fashion, in a manner commensurate with the proportionate share of each.

136.    StoneArch IV's failure to perform the above-described obligations, as well as its failure to perform other obligations as may be discovered in the course of litigation, constitutes material breaches of the Beal Participation Agreement by StoneArch IV and/or willful misconduct by StoneArch IV.

137.    In addition, StoneArch IV has breached the Beal Participation Agreement and/or committed willful misconduct, among other ways, by taking the following actions:

    a.    Without Beal's consent, waiving payment and/or failing or refusing to recover payment of principal and/or interest on the Hoyt Loan;

    b.    Without Beal's consent, waiving and/or failing or refusing to enforce the due date of payment on the Hoyt Loan;

    c.    Without Beal's consent, effectively extending the due date of payment on the Hoyt Loan and not declaring the Hoyt Loan in default;

1583619-EA 2

d.   Without Beal's consent, waiving and/or failing or refusing to enforce the maturity of the Hoyt Loan;

e.   Receiving distributions and/or dividends from the IRET units held as collateral and failing to pay a pro rata share of such proceeds to Beal.

138.   Additionally, StoneArch IV breached its duties of good faith and fair dealing owed to Beal.

139.   As a direct and proximate result of StoneArch IV's breaches of the Beal Participation Agreement and/or StoneArch IV's willful misconduct, Beal has suffered and continues to suffer damages in an amount to be determined at the time of trial but which is reasonably believed to greatly exceed $75,000.

## COUNT X:  UNJUST ENRICHMENT/QUANTUM MERUIT
### (Against Crown, Citizens, North American, Bruce K. Hoyt and StoneArch IV)

140.   Beal realleges and incorporates by reference the allegations contained in Paragraphs 1 through 139 above.

141.   Crown breached its duty of care owed to Beal as a direct and proximate result of Crown's wrongful actions and conduct as described in detail above, including but not limited to, the following:

a.   Failing or refusing to fully and accurately communicate material information to Beal, including but not limited to, information related to the collateral securing the Hoyt Loan;

b.   Failing or refusing to fully and accurately communicate material information to Beal related to its role as "Lead Bank," as that term is defined in the Beal Participation Agreement—particularly following the execution of the "Loan Purchase and Sale Agreement;" and

c.   Failing or refusing to fully and accurately communicate material information to Beal related to which entity, if any, is now responsible for servicing the Hoyt Loan following the execution of the "Loan Purchase and Sale Agreement."

1583619-EA 2

142.     Additionally, Crown acted unfairly and unjustly by obtaining substantial collateral to secure one or more of its loans to Hoyt and/or entities he controls (at least one of which loans is participated in by Citizens and North American).

143.     Through the actions described in detail above, Crown, Citizens, North American, Bruce K. Hoyt, and StoneArch IV have been, and will continue to be, unjustly enriched to the detriment of Beal.

144.     It is unjust and inequitable to permit Crown, Citizens, North American, Bruce K. Hoyt, and StoneArch IV to benefit from Crown's scheme, and their other wrongful conduct and actions as described in more detail above all to the detriment of Beal.

145.     Equity and justice mandate that Crown, Citizens, North American, Bruce K. Hoyt, and StoneArch IV be required to reimburse or otherwise compensate Beal fairly and equitably in an amount to be determined at the time of trial but which is reasonably believed to greatly exceed $75,000.

### COUNT XI:  AIDING AND ABETTING
### (Against Citizens, North American, Bruce Hoyt and StoneArch IV)

146.     Beal realleges and incorporates by reference the allegations contained in Paragraphs 1 through 145 above.

147.     As hereinabove described and alleged, Crown has commited multiple torts against Beal which have caused damages and injury to Beal.

148.     Citizens, North American, StoneArch IV, and Bruce K. Hoyt knew that Crown's conduct constituted torts against Beal.

149.     StoneArch IV, by entering into the "Loan Purchase and Sale Agreement," substantially assisted and encouraged Crown in the achievement of its torts against Beal.

150.   Citizens and North American, by concealing the truth from Beal and entering into Participation Agreements in connection with the Crown loan to StoneArch IV necessary to finance the transaction contemplated by the "Loan Purchase and Sale Agreement," substantially assisted and encouraged Crown in the achievement of its torts against Beal.

151.   Bruce K. Hoyt knew about Crown's plan (e.g., scheme) and actively participated in it, for example, by contributing at least $412,500 towards the transfer that resulted in a corresponding "PAYDOWN" on the Hoyt Loan, and ratified these actions by virtue of his being a co-owner of StoneArch IV and participating in the plan as discussed above.  By these actions, Bruce K. Hoyt substantially assisted and encouraged Crown in its perpetrating its torts against Beal.

152.   As a direct and proximate cause of the aiding and abetting of Crown's torts against Beal by StoneArch IV, Citizens, North American, and Bruce K. Hoyt, Beal has incurred significant injury and damages in an amount to be determined at the time of trial but which is reasonably believed to greatly exceed $75,000.

## COUNT XII: CONSPIRACY
### (Against Crown, Citizens, North American, Bruce K. Hoyt and StoneArch IV)

153.   Beal realleges and incorporates by reference the allegations contained in Paragraphs 1 through 152 above.

154.   Crown, Citizens, North American, Bruce K. Hoyt, and StoneArch IV agreed to commit an unlawful act or a lawful act by unlawful means, specifically including but not limited to Beal's claims for conversion, tortious interference with contract, fraud and misrepresentation, and fraudulent concealment/non-disclosure, hereinabove described and alleged.

155.   The conduct of Crown, Citizens, North American, Bruce K. Hoyt, and StoneArch IV demonstrates a meeting of minds regarding a common plan or purpose of action to achieve

their desired result by, for example: (A) entering into the "Loan Purchase Agreement;" (B) creating StoneArch IV for the specific and sole purpose of obtaining a transfer of only the non-Beal rights to the Hoyt Loan; (C) engaging in loans from Crown to StoneArch IV and Bruce K. Hoyt for purpose of funding the transfer of only the non-Beal rights to the Hoyt Loan; (D) retaining 100% of various payments and proceeds despite Beal possessing an undivided 50% interest in the Hoyt Loan; (E) refusing to produce a complete set of Hoyt Loan-related documents to Beal despite repeated written demands from Beal to StoneArch IV and Crown; and (F) maintaining the secrecy of the true nature of the transactions engaged in to perpetrate the scheme.

156. The conversion, tortious interference with contract, fraud and misrepresentation, and fraudulent concealment/non-disclosure, hereinabove described and alleged, actually occurred.

157. As further evidence of their desire to harm Beal and ensure that Beal does not receive the benefits to which it is entitled under the Beal Participation Agreement, Crown went so far as to provide the financing needed by StoneArch IV to buy the Hoyt Loan and not just at the same rate in the underlying debt, but at 3.5% interest rate—nearly a 50% discount from the interest rate applicable to the Hoyt Loan—and far below prevailing market interest rates. Moreover, Crown made the loan to StoneArch IV despite the obvious risk factors associated with making a nearly million dollar loan to a newly formed, special purpose entity, that possessed only $1,400 in assets other than the participation interest in a past due, non-performing loan that it had purchased at par value (*i.e.*, without any discount).

158. As a direct and proximate cause of the conspiracy by Crown, Citizens, North American, Bruce K. Hoyt, and StoneArch IV, Beal has incurred significant injury and damages

1583619-EA 2

in an amount to be determined at the time of trial but which is reasonably believed to greatly exceed $75,000.

## COUNT XIII: DECLARATORY JUDGMENT
### (Against Crown, Citizens, North American and StoneArch IV)

159.    Beal realleges and incorporates by reference the allegations contained in Paragraphs 1 through 158 above.

160.    In accordance with the Beal Participation Agreement, under which Beal has performed all of its obligations, Beal is entitled to, among other things, share proportionately with Crown in all payments received under or pursuant to the Participation Agreement and to maintain its proportionate share of security in all collateral.

161.    The issues raised by Beal in this matter, namely the status of its proportionate share of all payments received—past and future—and its proportionate share of security in all collateral, meet all the requirements of 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57, such that this Court may resolve the issues raised herein by declaratory judgment.

162.    Beal seeks a declaration by the Court that it is entitled to, among other things, share proportionately in all payments received—past and future—on the Hoyt Loan as well as a declaration that it is entitled to maintain its proportionate share of security in all collateral securing the Hoyt Loan.

163.    Beal requests an immediate declaration, decree, and order by the Court placing it in the position of lead lender under the Beal Participation Agreement in place, and instead of, either Crown or StoneArch IV and precluding either Crown or StoneArch IV from operating in any way as the lead lender under the Agreement. The order, decree, and change in status are warranted by the conduct of the defendants as alleged and described in this Complaint and necessary to protect the interests and rights of Beal under the Beal Participation Agreement.

1583619-EA 2

## DEMAND FOR A JURY TRIAL

Beal demands a jury trial for all claims so triable

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment in its favor against Defendants as follows:

1.       Awarding Plaintiff a judgment against each of the Defendants in an amount greater than $75,000, the exact amount to be proven at trial;

2.       Declaring Beal's rights and interests under the Beal Participation Agreement and placing Beal in the position of lead lender under the Beal Participation Agreement;

3.       Creating a constructive trust in its rights and interest in the Hoyt Loan as set forth in the Beal Participation Agreement and in the proceeds of all money and/or proceeds credited to the Hoyt Loan account or other property received by Crown as a result of the Hoyt Loan, as well as any distributions from the units of IRET held as collateral;

4.       Awarding Plaintiff prejudgment interest;

5.       Awarding Plaintiff post-judgment interest on the judgment at a rate of at least 10% per year, or as otherwise specified by controlling Minnesota law (*see e.g.,* Minn. Stat. § 549.09); and

1583819-EA 2

6.   Awarding Plaintiff such other relief as the Court deems just and equitable.

Dated: Oct. 31, 2011

BOWMAN AND BROOKE LLP

By: _____

Richard G. Morgan (#157053)
richard.morgan@bowmanandbrooke.com
Charles (CJ) Schoenwetter (#025115X)
cj.schoenwetter@bowmanandbrooke.com
Michael R. Carey (#0388271)
michael.carey@bowmanandbrooke.com
150 South Fifth Street, Suite 3000
Minneapolis, MN  55402
Telephone: (612) 339-8682
Fax: (612) 672-3200

*ATTORNEYS FOR BEAL BANK USA*

1583619-EA 2